IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ELI VERNON III, aka ELI MIMS, §
§
       Petitioner, §
§
v. § No. 4:15-CV-855-Y
§
LORIE DAVIS, Director, §
Texas Department of Criminal §
Justice, Correctional §
Institutions Division, §
§
       Respondent. §

## OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner, Eli Vernon III, also known as Eli Mims, a state prisoner, against Lorie Davis, director of the Texas Department of Criminal Justice, Correctional Institutions Division, Respondent.

After having considered the pleadings and relief sought by Petitioner, the Court has concluded that the petition should be denied.

## I.   FACTUAL AND PROCEDURAL HISTORY

In January 2013 in Parker County, Texas, Case No. CR13-0053, Petitioner was indicted on one count of evading arrest or detention with a motor vehicle. (Adm. R., Clerk's R. 79, ECF No. 12-12.) A jury found Petitioner guilty, found that he used a deadly weapon in the course of committing the offense, found the enhancement

allegations in the indictment true, and assessed his punishment at 50 years' confinement. (*Id.* at 13.) Petitioner appealed his conviction, but the Eleventh District Court of Appeals of Texas affirmed the trial court's judgment and the Texas Court of Criminal Appeals refused Petitioner's petition for discretionary review. (*Id.,* Docket Sheet 2, ECF No. 9-5.) Petitioner also sought state postconviction habeas relief by filing a state habeas-corpus application, which was denied by the Texas Court of Criminal Appeals without hearing on the findings of the trial court. (*Id.,* Writ Rec'd & Action Taken, ECF Nos. 9-20 & 9-22.) The appellate court summarized the testimony at trial as follows:

> B.J. Ellis testified that, on the afternoon of November 14, 2012, he was at a gas station in Weatherford when Appellant approached him and tried to sell him jewelry. Appellant showed Ellis receipts from Gordon's Jewelers in an attempt to prove that the jewelry was real. Appellant stated that the jewelry was purchased with a stolen credit card and that he was willing to sell the jewelry for "pennies on the dollar." Ellis believed that Appellant was involved in criminal activity and rejected his offer.

> After Appellant walked away, Ellis called 911 and reported Appellant's behavior. Appellant drove off in what Ellis believed was a black Chevrolet Malibu, and Ellis followed him. Ellis continued to speak with the 911 dispatcher until the responding police officers located Appellant's vehicle. According to Ellis, the officers engaged Appellant and motioned for him to pull over. Appellant did not pull over; instead, he accelerated and erratically crossed lanes. Appellant was eventually detained, and Ellis confirmed that Appellant was the same individual who had attempted to sell him jewelry at the gas station.

> The 911 call was played for the jury. On the recording, Ellis reports that he is traveling on

Interstate 20, following a black Chevrolet Malibu, because the driver just attempted to sell him jewelry that was purchased with a stolen credit card. The 911 dispatcher can then be heard incorrectly relaying Ellis's report to police, stating that a man tried to sell Ellis a stolen credit card.

Captain William "Billy" Ray of the Willow Park Police Department (WPPD) testified that, on the afternoon of November 14, 2012, dispatch informed him that Ellis was following an individual who had just attempted to sell him a stolen credit card. Captain Ray then headed to Ellis's location in his marked police vehicle.

Captain Ray caught up with Ellis and observed that Officer Tracey Cryer was already in pursuit of Appellant. As Captain Ray and Officer Cryer chased Appellant, who was actually driving a black Chevrolet Impala,[2] they reached speeds up to 107 miles per hour. During the pursuit, Appellant drove recklessly through traffic and erratically switched lanes. Captain Ray noted that Appellant's behavior was consistent with someone who was fleeing from the police.

> [2]Captain Ray noted that a Chevrolet Malibu and a Chevrolet Impala are similar in appearance.

The pursuit finally ended when another car swerved in front of Appellant, which caused him to slam on his brakes and lose control of his vehicle. Appellant's vehicle struck a guardrail before it rammed into a light pole in the median of the highway and came to a stop.

Captain Ray parked his patrol car directly in front of Appellant's vehicle to prevent him from driving away. Captain Ray then drew his weapon and ordered Appellant to exit his vehicle. Appellant complied with the order, and Officer Cryer assisted him out of the vehicle.[3]

> [3]The video taken from the dashboard camera in Captain Ray's patrol vehicle was also played for the jury. The video corroborated Captain Ray's testimony.

Officer Cryer testified that, on November 14, 2012, he was notified by dispatch that the driver of a black Chevrolet Malibu, later confirmed to be Appellant, was reportedly in possession of stolen jewelry and/or a

stolen credit card. Officer Cryer then headed to Appellant's location in his marked patrol car. Officer Cryer eventually caught up to Appellant's vehicle and turned on his lights and siren.

Officer Cryer reported that the officers reached speeds up to 107 miles per hour while in pursuit of Appellant. Officer Cryer noted that Appellant drove recklessly and made it apparent that he did not want to stop. Appellant's vehicle eventually spun out of control, struck a guardrail, and hit a light pole in the median of the highway.

Officer Cryer subsequently searched Appellant's vehicle and found several small boxes containing various pieces of inexpensive costume jewelry, a bag of loose costume jewelry, and a number of receipts from Gordon's Jewelers. Officer Cryer noted that the receipts had several obvious errors on them that indicated they were fake.

Appellant made a motion for directed verdict and argued that the State had failed to prove each element of the charged offense. The trial court denied the motion.

(*Id.,* Mem. Op. 2-4, ECF No. 9-6.)


## II. ISSUES

Petitioner raises the following grounds for relief:

(1) He was denied his Sixth and Fourteenth Amendment right to a fair cross-section of the community on his venire panel;

(2) His indictment and jury charge failed to "give culpable mental state" thereby rendering the trial court's judgment void;

(3) He was subjected to an illegal search and seizure violating his Fourth and Fourteenth Amendment rights;

(4) The trial judge failed to give a mandatory jury instruction under article 38.23(a) of the Texas Code of Criminal Procedure in violation of his right to due process;

(5)   The trial judge erred in failing to grant a directed
      verdict;

(6)   He was denied his Sixth and Fourteenth Amendment
      right to effective assistance of counsel; and

(7)   He was denied effective review by the state
      appellate and habeas courts.

(Pet. 6-7(a), ECF No. 1.)

### III.   RULE 5 STATEMENT

Respondent does not believe that the petition is time-barred,
subject to the successive-petition bar, or that Petitioner has
failed to exhaust his state-court remedies as to the claims raised.
(Resp't's Answer 6, ECF No. 17.)

### IV.   LEGAL STANDARD FOR GRANTING HABEAS-CORPUS RELIEF

A § 2254 habeas petition is governed by the heightened standard
of review provided for in the Anti-Terrorism and Effective Death
Penalty Act (AEDPA). See 28 U.S.C. § 2254. Under the Act, a writ of
habeas corpus should be granted only if a state court arrives at a
decision that is contrary to or an unreasonable application of
clearly established federal law as established by the Supreme Court
or that is based on an unreasonable determination of the facts in
light of the record before the state court. *See* 28 U.S.C. §
2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011).
This standard is difficult to meet but "stops short of imposing a
complete bar on federal court relitigation of claims already
rejected in state proceedings." *Harrington*, 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. This presumption of correctness applies to both express and implied findings of fact. *Valdez v. Cockrell,* 274 F.3d 941, 948 (5th Cir. 2001). When the Texas Court of Criminal Appeals denies relief on a state habeas-corpus application without written order, typically it is an adjudication on the merits, which is likewise entitled to this presumption. *Ex parte Torres,* 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). In such a situation, a federal court may infer fact findings consistent with the state court's disposition and assume that the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied. *Townsend v. Sain,* 372 U.S. 293, 314 (1963); *Schartzle v. Cockrell,* 343 F.3d 440, 443 (5th Cir. 2003); *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir. 2002); *Valdez,* 274 F.3d at 948 n.11; *Goodwin v. Johnson,* 132 F.3d 162, 183 (5th Cir. 1997). A petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

Petitioner raised his claims in his state habeas application,

and, based on the record, the habeas court entered express findings that there were no controverted, previously unresolved facts material to the legality of Petitioner's confinement; that his claims were "not proper" for habeas relief; and that his claims were "without relief." (Adm. R., Writ 78, ECF No. 9-22.) The court therefore concluded that relief should be denied. In turn, the Texas Court of Criminal Appeals denied the application without written order on the trial court's findings. Thus, to the extent more particularized findings were not made by the state court as to each claim, this Court will infer fact findings consistent with the state courts' disposition and, absent any evidence that incorrect standards were applied, assume that the state courts applied correct standards of federal law as determined by the Supreme Court.

## V. DISCUSSION

### A. Fair Cross-Section

Under his first ground, Petitioner, who is African American, asserts that the jury panel did not represent a fair cross-section of the community because, although 200 jurors were summoned, only 53 appeared for duty of which there were "[n]o blacks and [only] one Hispanic." (Pet. 6, ECF No. 1.) He further asserts that the state acknowledges that it is not unusual that no "blacks" are in the jury pool but does nothing to correct the on-going problem or "maintain the integrity of the system." (Pet'r's Mem. 7-8, 11- ECF No. 2.)

Petitioner relies upon a report compiled by "The County Information Program" and a 2013 census measurement of actual percentage of African Americans (2.0%), Hispanic or Latino (11.2%), and other minority races (3.3%) in Parker County of an estimated population of 120,207. (Pet'r's Mem., Ex. A, ECF No. 2.)

County officials have an affirmative duty under the Sixth and Fourteenth Amendments to develop and use a system that will result in the placement of a fair cross-section of the community on jury rolls. *Taylor v. Louisiana,* 419 U.S. 522, 526-38 (1975); *Avery v. Georgia*, 345 U.S. 559, 561 (1953). To establish a prima-facie case for a violation of the Sixth Amendment's fair cross-section requirement, under *Duren v. Missouri,* 439 U.S. 357 (1979), a defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 364.

In its response to Petitioner's state habeas application, the state conceded the first prong of *Duren,* but contended that Petitioner in no way established the second and third prongs. (Adm. R., Writ 55, ECF No. 9-22.) Relevant to the second prong, the state explained that in Parker County,

> [v]eniremembers are chosen randomly, by computer through voter registration, driver's license and identification

> card registration lists by the Parker County District
> Clerk, as required by law. Some two hundred citizens are
> summoned for jury duty by the Parker County Sheriff as
> set forth by law for every jury week from the list
> prepared by the District Clerk.

(Adm. R., Writ 56, ECF No. 9-22.) The state further explained that

given the low percentage of African Americans in the county, "it

would not be unusual for no African-American citizens to appear on

any given randomly-generated list of only two hundred potential

jurors." (*Id.*) And, the state noted that the 2.0% figure did not

represent qualified jurors or take into account that some African

American citizens may have been summoned for Petitioner's trial but

did not appear. Finally, the state argued that Petitioner failed to

satisfy the third prong because his "information" related only to

the venire in his trial and there was no evidence establishing that

African Americans are systematically excluded from the pool of

potential jurors in Parker County. (*Id.* at 58-59.)

The state courts' rejection of the claim was reasonable in

light of the evidence, and in line with Supreme Court precedent on

the issue. The accepted methodology for determining the severity of

a minority group's underrepresentation on jury panels is to measure

the "absolute disparity" between the proportion of *jury-eligible*

members of a distinctive group in the relevant community and its

representation in jury venires for that same community. *See United

States v. Garcia,* 121 F.3d 704, 1997 WL 450169, at *3 (5th Cir.

1997); *United States v. Maskeny,* 609 F.2d 183, 189-90 (5th Cir.

1980). Petitioner failed to introduce any evidence establishing that the representation of African Americans on Parker County venires is not fairly and reasonably related to the number of such persons in the community who are *qualified* to sit on a jury. *Duren* does not require that "juries actually chosen must mirror the community." *Taylor,* 419 U.S. at 538. "The fair-cross-section requirement does not guarantee jur[ies] of any particular composition. Rather, it only guarantees that the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups." *Paredes v. Quarterman,* 574 F.3d 281, 289 (5th Cir. 2009) (internal quotations and citations omitted).

As to the third prong of *Duren,* the cause of underrepresentation must have been the result of systematic exclusion, or "inherent in the particular jury-selection process utilized." *Duren*, 439 U.S. at 366. It is the burden of the petitioner to make this showing. *United States v. Aponte-Suarez,* 905 F.2d 483, 492 (1st Cir. 1990). To accomplish this, a petitioner must demonstrate not only that the distinctive group is not adequately represented in his own jury venire, but also that this is the *general practice of other venires. See Timmel v. Phillips,* 799 F.2d 1083, 1083 (5th Cir. 1986). The Supreme Court cases that have addressed the cross-section issue have examined the selection process of a number of jury venires over a period of time. *See, e.g., Duren,* 439 U.S. at 366 (reviewing the discrepancies both over

a period of nearly a year and in the petitioner's specific case); *Taylor,* 419 U.S. at 524 (examining a period of almost one year). In *Duren,* the Court found that the petitioner's "demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic. . . ." 439 U.S. at 366. Here, in stark contrast to *Duren,* Petitioner presents only blanket statistics regarding the breakdown in population of whites and minorities in Parker County. He makes no showing of the selection process of a number of jury venires over a period of time. In short, Petitioner presented no relevant or persuasive evidence, statistical or otherwise, demonstrating the degree of underrepresentation or systematic exclusion of persons of his race or another identifiable group or how Parker County's procedure constitutes a system impermissibly susceptible to abuse and racial discrimination.

## B. Indictment and Jury Charge

In his second ground, Petitioner claims his indictment and jury charge "failed to give [a] culpable mental state rendering [the] judgment void." (Pet. 6, ECF No. 1.) Specifically, he argues that the absence of the term "<u>knowingly</u>" in the indictment and jury charge resulted in a failure to charge a culpable mental state. (Pet'r's Br. 13, ECF No. 2.) The indictment alleged that on or about November 14, 2012, Petitioner–

did then and there while using a motor vehicle intentionally flee from Tracey Cryer, a person the defendant knew was a peace officer who was attempting lawfully to arrest or detain the defendant.

(Adm. R., Clerk's R. 5, ECF No. 9-4.) The jury charge mirrored the indictment. (*Id.* at 17.)

Under § 38.04 of the Texas Penal Code, a "person commits an offense if he intentionally flees from a person he knows is a peace officer . . . attempting lawfully to arrest or detain him." TEX. PENAL CODE. ANN. § 38.04(a) (West Supp. 2014). Both the indictment and the jury charge track the language of the statute.

"[T]he sufficiency of a state indictment is not a matter for federal habeas corpus review unless it can be shown that the indictment is so defective that the convicting court had no jurisdiction." *Branch v. Estelle,* 631 F.2d 1229, 1233 (5th Cir. 1980). *See also McKay v. Collins,* 12 F.3d 66, 69 (5th Cir. 1994) ("An indictment should be found sufficient unless no reasonable construction of the indictment would charge the offense for which the defendant has been convicted."). State law dictates whether a state indictment is sufficient to confer a court with jurisdiction, and where the state courts have held that an indictment is sufficient under state law, a federal court need not address that issue. *McKay,* 12 F.3d at 68-69; *Yohey v. Collins,* 985 F.2d 222, 229 (5th Cir. 1993).

Petitioner raised his claim in his state habeas petition. The rejection of the claim by the Texas Court of Criminal Appeals

without written order implies the indictment is sufficient and forecloses federal habeas review. *See Wood v. Quarterman,* 503 F.3d 408, 412 (5th Cir. 2007) (because sufficiency of indictment was squarely presented to highest state court and that court held trial court had jurisdiction, claim is foreclosed to federal habeas review).

Further, an improper jury instruction rarely justifies federal habeas review. *Mayabb v. Johnson,* 168 F.3d 863, 867 (5th Cir. 1999). The jury charge tracked the statutory language and mirrored the indictment; thus, it cannot be considered inadequate to have informed the jury of all the elements it was required to consider. *Davis v. McAllister,* 631 F.2d 1256, 1260 (5th Cir. 1980). Petitioner fails to establish that the instruction was erroneous, much less that it by itself so infected the entire trial that the resulting conviction violates the Constitution. *Id.*

## C. Illegal Search and Seizure

Under his third, fifth, and seventh grounds, Petitioner claims his Fourth Amendment right to be free from illegal search and seizure was infringed when the police initiated their detention of him without reasonable suspicion; that the trial court violated his right to due process in denying his motion for a directed verdict when the state failed to prove the police had reasonable suspicion to initiate the detention; and that the state courts "erred in holding the police had reasonable suspicion to initiate detention

13

even when [the] facts were wrong." (Pet. 7, ECF No. 1.)

Petitioner raised his Fourth Amendment and due-process claims
on appeal in the context of his claim that the trial court erred in
denying his motion for directed verdict. Relying solely on state
law, the appellate court addressed the issue as follows:

> Appellant argues that the trial court erred when it
> denied his motion for directed verdict. Appellant
> specifically claims that the officers who attempted to
> detain him were not lawfully attempting to detain him; he
> asserts that the officers lacked reasonable suspicion to
> detain him because the 911 dispatcher incorrectly
> informed them that he was in possession of a stolen
> credit card.

> Under the Fourth Amendment, a warrantless detention
> of a person that amounts to less than a full-blown
> custodial arrest must be justified by reasonable
> suspicion. A police officer has reasonable suspicion to
> detain if he has specific, articulable facts that,
> combined with rational inferences from those facts, would
> lead him to reasonably conclude that the person detained
> is, has been, or soon will be engaged in criminal
> activity. "This standard is an objective one that
> disregards the actual subjective intent of the arresting
> officer and looks, instead, to whether there was an
> objectively justifiable basis for the detention."

> An officer is not required to confirm that a
> particular offense has been committed in order to have
> reasonable suspicion; it is enough that the information
> provided to the officer "is sufficiently detailed and
> reliable—*i.e.,* it supports more than an inarticulate
> hunch or intuition—to suggest that *something* of an
> apparently criminal nature is brewing." Moreover, the
> officer need not be personally aware of every fact that
> objectively supports reasonable suspicion; "rather, 'the
> cumulative information known to the cooperating officers
> at the time of the stop is to be considered in
> determining whether reasonable suspicion exists.'" A 911
> police dispatcher is generally regarded as a "cooperating
> officer" for purposes of making this determination.

> Furthermore, "information provided to police from a

14

citizen-informant who identifies himself and may be held to account for the accuracy and veracity of his report may be regarded as reliable." When information is obtained from a known citizen-informant, the only question is whether the information, "viewed through the prism of the detaining officer's particular level of knowledge and experience, objectively supports a reasonable suspicion to believe that criminal activity is afoot."

In this case, Ellis identified himself when he called 911; therefore, he could be held accountable for the accuracy and veracity of his report. Under these circumstances, we find that the information Ellis provided to the police was reliable. Ellis told the 911 dispatcher that someone had just attempted to sell him jewelry that had been purchased with a stolen credit card. The 911 dispatcher then incorrectly relayed Ellis's report by telling police that a man had tried to sell Ellis a stolen credit card. Captain Ray and Officer Cryer both testified that dispatch reported that Appellant was in possession of a stolen credit card.

Reasonable mistakes about facts may still legitimately justify an officer's conclusion that reasonable suspicion exists. Mistakes will not vitiate an officer's actions in hindsight so long as his actions were lawful under the facts as he reasonably, albeit mistakenly, perceived them to be. Although the 911 dispatcher and the responding officers were mistaken about the specific details of Ellis's report, we find that those mistakes were reasonable. Thus, the fact that Appellant was not in possession of a stolen credit card at the time of his arrest does not negate the officers' earlier conclusion that reasonable suspicion existed to detain him.

Based on our review of the evidence, we conclude that the totality of the circumstances gave rise to a reasonable suspicion that Appellant was involved in criminal activity. The facts, as they were provided to Captain Ray and Officer Cryer, were sufficient to suggest that "*something* of an apparently criminal nature [was] brewing."

The evidence presented at trial established that Appellant led police officers on a chase that lasted several minutes and reached speeds up to 107 miles per

hour. Given our earlier finding that the officers had reasonable suspicion to detain Appellant, we conclude that the evidence was sufficient because a rational jury could have found beyond a reasonable doubt that Appellant evaded arrest when he intentionally fled from the officers who were lawfully trying to arrest or detain him.

(Adm. R., Mem. Op. 5-7, ECF No. 9-6 (citations omitted) (emphasis in original).) Petitioner's Fourth Amendment and due-process claims were also rejected by the Texas Court of Criminal Appeals on state habeas review.

Under *Stone v. Powell,* 428 U.S. 465 (1976), a federal court may not grant habeas relief based on a Fourth Amendment violation where the state has provided an opportunity for full and fair litigation of the issue. *Id.* at 493-95. In order to obtain postconviction relief in federal court, a petitioner must plead and prove that the state-court proceeding was inadequate. *See Davis v. Blackburn,* 803 F.2d 1371, 1372 (5th Cir. 1986). Toward that end, Petitioner asserts that the appellate court "changed" officer Cryer's testimony to support its opinion by stating that officer Cryer "eventually caught up to Appellant's vehicle and turned on his lights and siren," when, in fact, the officer testified that he had his lights on prior to catching up to Petitioner to get traffic to move over. (Pet'r's Br. 10, ECF No. 2; Adm. R., Reporter's R., vol. 3, 113, ECF No. 9-10.) Petitioner further asserts that the Texas Court of Criminal Appeals' ruling is therefore rendered "moot due to the erroneous ruling" of the appellate court. (Pet'r's Br. 19, ECF No. 2.) Finally, he asserts that the state courts rendered their rulings without holding

16

"any hearings or investigation of the claims," despite his claims of judicial bias. (*Id.* at 19-20.)

First, the factual discrepancy in the appellate court's recitation of the facts is doubtless due to inadvertence and is immaterial–*i.e.,* insufficient to raise a disputed *fact* issue placing the constitutional validity of the stop in issue. Texas courts have held that if there is no genuine dispute of fact that is outcome-determinative, the legality of the conduct is determined by the trial judge alone, as a question of law. *See Madden v. State,* 242 S.W.3d 504, 509-10 (Tex. Crim. App. 2012). And, if other facts, not in dispute, are sufficient to support the lawfulness of the challenged conduct, the disputed fact issue is not submitted to the jury because it is not material to the ultimate admissibility of the evidence. *Id.* Second, Petitioner's claim of judicial bias is groundless. Third, since a hearing was held regarding the constitutional validity of the stop and detention at his trial, Petitioner cannot be heard to complain that he did not receive another evidentiary hearing in his state postconviction proceedings. Petitioner had a full and fair opportunity to litigate his claims in state court. Therefore, the *Stone* bar applies.

**D. Jury Instruction under Article 38.23(a)**

Under his fourth ground, Petitioner claims the trial court failed to instruct the jury pursuant to Texas Code of Criminal Procedure article 38.23(a), in violation of his right to due

process. (Pet. 7, ECF No. 1.) This ground relates to a violation of state law and is not cognizable in federal habeas corpus. *West v. Johnson,* 92 F.3d 1385, 1404 (5th Cir. 1996).

## E.    Ineffective Assistance of Counsel

Finally, under his sixth ground, Petitioner claims he received ineffective assistance of trial counsel because counsel failed to (1) object to the composition of the jury, (2) object to the faulty indictment and jury charge, (3) move for a jury instruction on reasonable suspicion and object to the trial judge's acting in the jury's capacity, and (4) object to incorrect jury argument by the prosecution during voir dire and closing argument. (Pet. 7(a) & Pet'r's Br. 9-10, ECF Nos. 1 & 2.)

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. *See* U.S. CONST. amend. VI, XIV; *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697. In applying this test, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.* at 668, 688-89. Judicial scrutiny of counsel's

18

performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689.

The Supreme Court emphasized in *Harrington v. Richer* the standard under which a federal court is to consider an ineffective-assistance-of-counsel claim raised in a habeas petition subject to AEDPA's strictures:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

562 U.S. 86, 101 (2011) (quoting *Williams v. Taylor,* 529 U.S. 362, 410 (2000)). Accordingly, it is necessary only to determine whether the state courts' rejection of petitioner's ineffective-assistance claims was contrary to or an objectively unreasonable application of *Strickland. Bell v. Cone,* 535 U.S. 685, 698-99 (2002); *Kittelson v. Dretke,* 426 F.3d 306, 315-17 (5th Cir. 2005); *Schaetzle v. Cockrell,* 343 F.3d 440, 443 (5th Cir. 2003).

Petitioner's first three ineffective-assistance claims are based upon one or more of the grounds raised in this federal petition. Applying the appropriate deference to the state courts'

implied factual findings, and having independently reviewed Petitioner's claims in conjunction with the state court records, it does not appear that the state courts' application of *Strickland* was objectively unreasonable. There was no legal basis for counsel to object to the composition of the jury pool or the sufficiency of the indictment or request an instruction under article 38.23(a). Counsel is not required to make frivolous or futile motions or objections. *Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir. 2002); *Green v. Johnson,* 160 F.3d 1029, 1037 (5th Cir. 1988).

Petitioner also claims counsel was ineffective by failing to object to the prosecution's "misstatements on their burden of proof during voir dire and closing argument of [the] guilt/innocence phase" of his trial. (Pet'r's Br. 17, ECF No. 2.) Specifically, Petitioner complains of the prosecutor's statements "that the state was not required to prove why Petitioner ran." (*Id.* at 18.) As a matter of state law, motive is not an essential element of a crime. *Bush v. State,* 628 S.W.2d 441, 444 (Tex. Crim. App. 1982); *Rodriguez v. State,* 486 S.W.2d 355, 358 (Tex. Crim. App. 1972). The Court does not find the complained-of statement in the prosecutions's closing arguments. When the prosecutor's voir dire is read in context, it is evident he was explaining to the jury that the state only had to prove the elements of the offense. (Adm. R., Reporter's R., vol. 2, 20, ECF No. 9-9.) Since the prosecutor's remarks were not improper, trial counsel was not obligated to object. As previously noted,

counsel is not required to make frivolous objections. *Johnson,* 306 F.3d at 255; *Green,* 160 F.3d at 1037.

Petitioner has not demonstrated deficient performance or shown any reasonable probability that the outcome of his trial would have been different but for counsel's deficient representation. A petitioner shoulders a heavy burden to overcome a presumption that his counsel's conduct is strategically motivated and to refute the premise that "an attorney's actions are strongly presumed to have fallen within the wide range of reasonable professional assistance." *Messer v. Kemp,* 760 F.2d 1080, 1090 (11th Cir. 1985). Petitioner has presented no evidentiary, factual, or legal basis in this federal habeas action that could lead the Court to conclude that the state courts unreasonably applied the standards set forth in *Strickland* based on the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

For the reasons discussed, the Court DENIES Petitioner's petition for a writ of habeas corpus under 28 U.S.C. § 2254.

Further, a certificate of appealability will not be issued. Such a certificate may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner satisfies this standard by showing "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists of reason could conclude the issues presented are adequate to deserve

encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 326 (2003)(citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Upon review and consideration of the record in the above-referenced case as to whether Petitioner has made a showing that reasonable jurists would question this Court's rulings, the Court determines he has not and that a certificate of appealability should not issue for the reasons stated in this order.

Therefore, a certificate of appealability should not issue.

SIGNED April 13, 2017.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE